**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DEBORAH JILL CHITESTER,<br><br>Plaintiff,<br><br>v.<br><br>STACY LAW, *et al.*,<br><br>Defendants. | Civil Action No. 17-12650 (MAS) (DEA)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

      This matter comes before the Court on Defendants Ahmad Ali, Aubrey Gilbert, Cathee Chichester, Christian Carkeek, Christine Idland ("Idland"), Deborah Gomez, Denise Goodnow, Diana Hack, Ellis Allen, Enzert Hewitt, Jill McMahon, Jasmin Ellis, Maureen Carvelli, Lilian Saddik, Nicole Bolt, Nkoyo Isuk, Omolabake Adegoke, Richard Cowell, Rosalind Arnold-Plunkett, Shereen Brown, Sneha Shah, Stacey Barnes, Staci Law, Terri Dyous, Tiana Smith, Wanda Thomas, Yeimmy Gaines, and Robyera Revoal's (collectively the "DCPP Defendants") motion to dismiss Plaintiff Deborah Jill Chitester's ("Plaintiff") Second Amended Complaint ("SAC"). (ECF No. 136.) Plaintiff opposed (ECF No. 137), and the DCPP Defendants replied (ECF No. 141). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, the Court grants DCPP Defendants' motion.

I.        **BACKGROUND**[1]

Prior to December 14, 2014, Plaintiff lived with her daughter, L.C., a minor. (SAC ¶ 52, ECF No. 131.) On December 20, 2014, an unnamed employee of the Department of Child Protection and Permanency ("DCPP") came to Plaintiff's home based on an anonymous tip that the home was unsafe and uninhabitable. (*Id.* ¶ 56.) Plaintiff alleges that she was cooperative with the employee, that the employee observed the interior of the home, and that the employee commented that the home had "more boxes . . . than the last time." (*Id.* ¶¶ 58-59.) Plaintiff alleges that a short time later, a police officer arrived at her home along with the DCPP employee. (*Id.* ¶ 61.) According to Plaintiff, the DCPP employee stated that he talked to a supervisor who had directed that L.C. be removed from the home. (*Id.* ¶¶ 61-62.) Because L.C. was staying with her father,[2] a DCPP employee allegedly called L.C.'s father and notified him that L.C. should remain in his custody pending a removal hearing and that L.C. was not to be returned to Plaintiff's home until a further determination was made. (*Id.* ¶¶ 64-65.) While Plaintiff admits that she is "messy, disorganized, and procrastinates with organizing," she alleges that she was never diagnosed as a "hoarder" prior to L.C.'s removal from the home, "nor was her home ever declared a danger by an inspector or law enforcement agency." (*Id.* ¶¶ 67, 82.)

Plaintiff alleges that shortly after the DCPP's visit to her home, DCPP personnel questioned L.C. at her father's home, and that at the outset of the interview, L.C. "continuously expressed that she felt safe, was not and never was in any danger in her home, and that she wanted to be returned to Plaintiff." (*Id.* ¶ 70.) According to Plaintiff, however, L.C. "was pressured into changing her answers," eventually stating that "the home presented safety concerns." (*Id.* ¶ 71.)

---

[1] The relevant facts are derived from the SAC and assumed true for the purposes of this motion.

[2] Plaintiff is divorced from L.C.'s father. (SAC ¶ 55.)

On December 23, 2014, there was a hearing in state court regarding L.C.'s removal, which resulted in the issuance of a court order that placed L.C. in her father's care. (*Id.* ¶¶ 73-77.) Plaintiff alleges that no expert report, police report, building inspector report, or other evidence was presented to the state court, and that the only materials presented were pictures of her home and unspecified "manipulative language contained in section G-K of DCPP's complaint in support of removal." (*Id.* ¶¶ 74-75.) Further, Plaintiff alleges that during a psychological evaluation in April 2015, L.C. "continuously expressed a desire to return home, that she deeply missed her mother, and that Plaintiff's home was not uninhabitable and was safe." (*Id.* ¶ 79.) According to Plaintiff, L.C.'s father participated in that same interview and described the DCPP's characterizations of Plaintiff's home as "unrealistic." (*Id.* ¶ 81.)

Plaintiff alleges that as a result of the state court's removal order, and in order to be considered for live-in care of L.C. again, she had to attend Catholic Charities for mental health therapy and evaluations and to improve the physical appearance of the interior of her home. (*Id.* ¶ 84.) According to Plaintiff, in March 2015, DCPP sent a "hoarding" service to her home; however, Plaintiff purportedly became anxious as she found the term "hoarder" offensive and inapplicable to her situation. (*Id.* ¶¶ 87-89.) Plaintiff declined the service because the only assistance it purportedly provided was trash removal, and Plaintiff's home was not full of trash, but rather her possessions were scattered and/or in boxes. (*Id.*) As a result of Plaintiff declining the "hoarding" service, she alleges that the DCPP Defendants refused to provide any further assistance. (*Id.* ¶ 91.)

However, in June 2016, Idland and other unnamed DCPP employees assisted Plaintiff's effort to improve her home's condition. (*Id.* ¶ 92.) Plaintiff alleges that during this visit, unspecified DCPP employees—not Idland—continuously referred to Plaintiff as a "hoarder." (*Id.*

¶ 93.) In addition, Idland and the other unspecified DCPP employees told Plaintiff that if she did not allow them to throw things away, they would leave, despite Plaintiff's pleas to allow her to review the documents or for assistance in organizing the documents and boxes. (*Id.* ¶ 94.) When Plaintiff refused, Idland and the DCPP employees stated that they would recommend to their supervisor that L.C. remain with her father indefinitely. (*Id.* ¶ 96.)

Plaintiff further alleges that nearly a year later, in April 2017, she hired Barbara Berman, a "certified professional organizer," who taught Plaintiff "various methods to organize, and the tools necessary to organize, and where appropriate, dispose of certain items to declutter her home." (*Id.* ¶¶ 101-03.) Plaintiff alleges that Berman assisted her in "decluttering" and improving the condition of the interior of her home on three occasions in April and May 2017. (*Id.* ¶ 104.) Plaintiff claims that while some unnamed DCPP employees recognized the improvement following Berman's assistance, other unnamed employees "maintained a hostile attitude towards Plaintiff." (*Id.* ¶ 110.) Plaintiff alleges that despite the improvement in her home, DCPP employees declined to provide her with the assistance that she needed. Instead, she alleges that they demonstrated their bias toward her by assisting L.C.'s father "every step of the way." (*Id.* ¶¶ 112-16.) Plaintiff also contends that she suffered stress, anxiety, and depression in response to the actions of DCPP employees and that the DCPP Defendants' actions caused her relationship with L.C. to deteriorate. (*Id.* ¶ 122.) According to Plaintiff, she has "no relationship" with L.C., and she has suffered financial hardship because the stress of these events caused her to struggle with consistent employment. (*Id.* ¶¶ 127-33.)

On December 4, 2017, Plaintiff commenced this action against the DCPP, asserting claims under § 1983, state-law tort claims, and claims under the Americans with Disabilities Act and the Rehabilitation Act.  (Complaint, ECF No. 1.)  DCPP moved to dismiss the Complaint, and on

December 17, 2018, this Court granted that motion, finding that sovereign immunity barred Plaintiff's § 1983 and state tort claims, and that Plaintiff's claims under the Americans with Disabilities Act and the Rehabilitation Act were time-barred. (*See* "Prior Opinion" at 2, ECF No. 41.) The Court advised that Plaintiff could file an amended complaint, but it ordered that the amended pleading could assert only § 1983 or tort claims against individual officers of DCPP, and that those claims had to be asserted against such defendants in their individual capacities. (Prior Opinion 2.)

On February 18, 2022, Plaintiff filed an amended complaint. (*See* ECF No. 123.) On July 7, 2022, with consent of all counsel and approval of the Court, Plaintiff filed a second amended complaint, the operative pleading ("SAC"). The SAC asserts five causes of action against the DCPP Defendants for violations of Plaintiff's constitutional rights pursuant to § 1983 and defamation. (ECF No. 131.) On September 16, 2022, the DCPP Defendants filed the instant motion to dismiss. (Defs.' Moving Br., ECF No. 136.)

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion to dismiss for failure to state a claim, the moving party "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)); *Haney v. USA Gymnastics, Inc.*, No. 21-07213, 2022 WL 909871, at *2 (D.N.J. Mar. 29, 2022). When reviewing a motion to dismiss for failure to state a claim, courts first separate the factual and legal elements of the claims and accept all of the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). While Federal Rule of Civil Procedure 8(a)(2) does not require that a

complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

## III.   DISCUSSION

As a threshold matter, the DCPP Defendants argue that Plaintiff's claims are time barred.[3] (Defs.' Moving Br. 11-13.) As for Plaintiff's § 1983 claims, the DCPP Defendants submit that those claims are based on the alleged removal of L.C. from Plaintiff's custody on December 14, 2014, following an investigation into allegations of child abuse and neglect. (*Id.* at 11.) As such, the DCPP Defendants argue that the date of accrual of Plaintiff's § 1983 claims is December 23, 2014, when the state court entered its removal order. (*Id.* at 12.) Because Plaintiff filed her § 1983 claims after December 23, 2016, the DCPP Defendants maintain that dismissal is warranted. (*Id.* at 13.) Similarly, as to Plaintiff's defamation claims, the DCPP Defendants highlight that the latest

---

[3] While the statute of limitations is typically an affirmative defense that cannot be addressed on a motion to dismiss, there is an exception where, as here, the complaint facially demonstrates noncompliance with the limitations period. *County of Hudson v. Janiszewski*, 520 F. Supp. 631, 649 (D.N.J. 2007).

incident of a DCPP employee or representative allegedly referring to Plaintiff as a "hoarder" occurred during a June 2016 visit to her home. (*Id.*) Given the one-year statute of limitations for such claims, Plaintiff was required to file her defamation claims by June 2017. (*Id.*) Because her original complaint was not filed until December 2017, Defendant argues that Plaintiff's defamation claims should also be dismissed. (*Id.*)

In response, Plaintiff argues that the DCPP Defendants misinterpret and misdirect the facts of the SAC. Plaintiff contends that her claims are "not isolated to a single, or two individual events, but rather, a series of events, all of which touch upon and in consequence violate Plaintiff's fundamental rights." (Pl.'s Opp'n Br. 14.) Specifically, she argues that the DCPP Defendants' conspiracy "began in or around 2014, however, their conduct continued well past two years after the fact, and thus, because these actions as pled are affirmative and continuous, the continuing violations doctrine may also sufficiently be applied to survive a statute of limitation defense." (*Id.*) In that connection, Plaintiff submits that she has sufficiently asserted claims under § 1983 and for defamation based on events that occurred in "2015, 2016, and 2017." (*Id.* at 15.) The Court agrees with the DCPP Defendants' position and will address Plaintiff's claims, in turn.

A.    **Section 1983**

Section 1983 claims are subject to New Jersey's two-year statute of limitations on personal injury actions. *See Patyrak v. Apgar*, 511 F. App'x 193, 195 (3d Cir. 2013) (*per curiam*) (citing *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010)). The date when a cause of action under § 1983 accrues is determined by federal law. *See Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (citing *Genty v. Resolution Trust. Corp.*, 937 F.2d 899, 919 (3d Cir. 1991)). "Under federal law, a cause of action accrues, and the statute of limitations begins to run when the plaintiff knew or should have known of the injury upon which its action is based." *Id.* (internal quotation marks

and citations omitted). "As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury." *Id.* (citing *United States v. Kubrick*, 444 U.S. 111, 120 (1979)).

The continuing violations doctrine, which Plaintiff attempts to rely on here, is an equitable exception to the timely filing requirement, which states that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period." *Cowell v. Palmer Township*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks and citation omitted). However, "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Id.* at 293 (quoting *Ocean Acres Ltd. v. Dare Cnty. Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983)).

In *Rose v. County of York*, the Third Circuit considered whether the damages resulting from the enforcement of a custody order constituted a "continuing violation." 262 F. App'x 485, 487 (3d Cir. 2008). The Third Circuit found that the "mere 'enforcement' of the order, without more," could not constitute a continuing violation because the purported continuing violation arose not from a continual unlawful act, but "from the ill effects of the original alleged violation," *i.e.*, the custody order. *Id.*

Similarly, the Court finds the decisions in *Bennett v. Susquehanna County Children & Youth Services*, 592 F. App'x 81, 84-85 (3d Cir. 2014), and *Edelglass v. New Jersey*, No. 14-760, 2015 WL 225810, at *18 (D.N.J. Jan. 16, 2015), applicable. In *Bennett*, a mother brought a § 1983 action against Susquehanna County Children & Youth Services after her children were taken by the state agency and sent to live with their paternal grandmother when doctors discovered that one of the children had suffered a bone fracture and bruising. 592 F. App'x at 82. The plaintiff claimed that, when trying to regain custody of her children, she was intimidated by the defendants who

stated she would "never see [her children] again." *Id.* While the state agency argued that her claims were time barred, the plaintiff maintained that the statute of limitations should be tolled under federal equitable tolling principles and/or the continuing violations doctrine. *Id.* The Third Circuit, however, affirmed the district court's finding that the continuing violations doctrine did not apply, finding that plaintiff could not "use the continuing violations doctrine to circumvent the statute of limitations when [the plaintiff] was well aware of the alleged emotional distress" at the time that the child safety plan was executed. *Id.* at 86. Likewise, in *Edelglass*, this Court found that the continuing violations doctrine did not apply because the plaintiffs' § 1983 claims arose from the fact that the plaintiffs were unable to parent their children following a particular hearing date or court order. No. 14-760, 2015 WL 225810, at *18. In response to the defendants' arguments that their § 1983 claims were barred by the statute of limitations, the plaintiffs asserted that the court orders to which they were subjected resulted in ongoing injuries, and so the orders constituted a continuing violation of their rights. *Id.* This Court disagreed. The Court noted that the purportedly unlawful acts at issue were either the "alleged absence of plenary hearings or the issuance of the orders that followed." *Id.* As a result, the Court found that "[t]he fact that [the p]laintiffs were unable to parent their children following the hearings or the orders '[arose] from the ill effects of the original alleged violation,' but this continuing effect does not amount to a 'continual unlawful act.'" *Id.* (quoting *Cowell*, 263 F.3d at 293).

Here, as in *Rose*, *Bennett*, and *Edelglass*, Plaintiff's claims—that the investigation and enforcement of the removal order violate her rights—do not amount to continuing violations which would provide for an equitable exception to the statute of limitations because they "arise from the ill effects of the original alleged violation," rather than a continuing unlawful act. *See Rose*, 262 F. App'x at 487; *see also Cowell*, 263 F.3d at 293. Specifically, Plaintiff's § 1983 claims in Counts

I, II, and V relate to the DCPP Defendants' (1) removal of L.C. from Plaintiff's custody "without proper or just cause and/or authority, in the absence of any exigency, and without first obtaining a warrant or other court order"; (2) purported knowing presentation of "deceptive evidence," "deliberate false statements," and "omissions of exculpatory material" during the removal hearing in state court; and (3) supposed efforts to "hinder [her] progress of court appointed requirements to regain her parental rights." (SAC ¶¶ 147, 158-59, 182.) The focal point of these allegations is the state court's removal order on December 23, 2014. Certainly, it was at that time—when L.C. was removed from Plaintiff's custody—that Plaintiff should have been aware that her constitutional rights had allegedly been violated by the DCPP Defendants. *See Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 417 n.6 (3d Cir. 2003) (finding that the doctrine "does not apply when plaintiffs are aware of the injury at the time it occurred."). Indeed, the continuing violations doctrine is "not a substitute for a plaintiff's 'awareness of and duty to assert his/her rights' in a timely fashion." *Bennet*, 592 F. App'x at 85 (quoting *Cowell*, 263 F.3d at 295). Plaintiff cannot point merely to the isolated actions of unnamed and unidentified DCPP officials in response to her efforts to comply with the requirements for regaining custody set forth in the state court removal order as indicia of a continued violation for purposes of tolling the statute of limitations.

Based on the Court's finding that the continuing violations doctrine is inapplicable, Plaintiff's § 1983 claims against the DCPP Defendants should have been filed by December 23, 2016—two years from the state court's removal order. Given that Plaintiff's initial complaint in this action, which only asserted § 1983 claims against the DCPP, was not filed until December 4, 2017, the two-year statute of limitations bars Plaintiff's § 1983 claims. Counts I, II, and V are dismissed with prejudice.

10

### B.     Defamation

The parties agree that under New Jersey law, defamation claims are subject to a one-year statute of limitations. N.J. Stat. Ann. § 2A:14-3 ("Every action at law for libel or slander shall be commenced within [one] year next after the publication of the alleged libel or slander."); *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 206 (D.N.J. 2011) (explaining a defamatory statement is "published" when it is communicated to a person other than the one defamed). The discovery rule exemption that tolls the statute of limitations in torts claims until an aggrieved party learns of his injury is inapplicable to defamation claims under New Jersey law. *Lawrence v. Bauer Publ'g & Printing Ltd.*, 78 N.J. 371, 374 (1979). Instead, New Jersey law mandates that the statute of limitations for a defamation claim begins to run from the date of publication. *Id.* at 374-75; *O'Donnell v. Simon*, 362 F. App'x 300, 305 (3d Cir. 2010) (affirming a district court's dismissal of plaintiff's defamation claim filed over one year after the incident as time barred).

Here, Plaintiff does not dispute that the only basis for her defamation claims are statements made by the DCPP Defendants that labeled her a "hoarder." According to Plaintiff, the DCPP Defendants were aware that "Plaintiff did not carry a medical diagnos[is] of being a 'hoarder' and even after Plaintiff's attempt to correct [the unidentified DCPP employees], they willfully and maliciously continued to publish or cause to publish the false and defamatory statements regarding Plaintiff." (SAC ¶ 167.) Plaintiff also does not dispute that the latest incident alleged in the SAC of such purportedly defamatory statements occurred during a visit to her home by unidentified DCPP officials in June 2016. (*Id.* ¶ 93 ("During this visit by DCPP, Defendant Does continuously referred to Plaintiff as a 'hoarder' and were patently hostile towards Plaintiff regarding the condition of her home.").) Thus, giving Plaintiff the benefit of the doubt, her defamation claims would need to be filed no later than June 30, 2016. Plaintiff's defamation claims, however, were

not asserted against the DCPP Defendants until she amended her complaint on February 18, 2022—more than five years after the alleged defamatory statements were made. (*See generally* SAC.) Indeed, Plaintiff's initial complaint in this case, which was only filed against the DCPP and did not assert any defamation claims, was not filed until December 4, 2017—well over one year after the DCPP officials visited Plaintiff's home and made those statements. Therefore, even relying on the relation back doctrine,[4] the Court finds that Plaintiff's defamation claims in Counts III and IV are untimely.

---

[4] The relation-back doctrine "essentially relaxes the statute of limitations in certain circumstances such that a claim set forth in 'an amended pleading "relates back" to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations.'" *Heinrich v. Jewish Cmty. Ctr. Metrowest, Inc.*, No. 18-17665, 2020 WL 3790517, at *2 (D.N.J. July 7, 2020) (citing *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010)). Ultimately, "relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 646 (2005).

The Court, accordingly, finds that Plaintiff's claims under § 1983 and for defamation are time barred.[5]

---

[5] Because Plaintiff's claims are time-barred, the Court does not reach the merits of the parties' qualified immunity, *res judicata*, and *Rooker-Feldman* doctrine arguments. (*See* Defs.' Moving Br. 13-20, 20-21, 22-25; Pl.'s Opp'n Br. 15-24, 24-25, 28-29.) Nonetheless, the Court notes that even if Plaintiff's claims were not time barred, it appears that the DCPP Defendants would be entitled to qualified immunity. When a defendant in a § 1983 action claims qualified immunity, the court must undertake a two-part inquiry. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). At the first prong, the Court asks if the facts, "[t]aken in the light most favorable to the party asserting the injury . . . show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). At the second prong, the Court asks "whether the right was clearly established," *id.*, because "the contours of the right must be sufficiently clear such that the unlawfulness of the action [wa]s apparent in light of pre-existing law." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 993 (3d Cir. 2014) (citation and internal quotation marks omitted). Here, in response to the DCPP Defendants' qualified immunity argument, Plaintiff merely cites Supreme Court cases for the broad proposition that parents have a recognized fundamental right to "establish a home and bring up children." (Pl.'s Opp'n Br. 15-16.) This is insufficient. *See Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 168 (3d Cir. 2016) (finding that in the context of qualified immunity, a plaintiff must show "sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited.") (quoting *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d. Cir. 2001)); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'") (quoting *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775-76 (2015)). As for Plaintiff's defamation claims, it appears that the DCPP Defendants also have qualified immunity from those claims under the New Jersey Tort Claims Act ("NJTCA"). The NJTCA grants a qualified immunity from liability for injuries and damages if the public employee acts in good faith in the execution or enforcement of any law. *See* N.J. Stat. Ann. § 59:3-3. Public employees will not be held liable under the NJTCA if they can establish that their acts were objectively reasonable or that they performed them with subjective good faith. *See Canico v. Hurtado*, 144 N.J. 361, 365-66 (1996). Here, Plaintiff suggests that the DCPP Defendants were prohibited from using the term "hoarder" to describe her unless a medical professional provided a formal psychological diagnosis of a mental condition; however, Plaintiff provides no legal support for that position. Thus, it appears that the DCPP Defendants had an objective good faith basis for using the word "hoarder," as it is commonly understood, to describe a "messy" and "disorganized" home.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the Court grants DCPP Defendants' motion to dismiss and dismisses Plaintiff's SAC with prejudice.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**